ROLLINGS v. EVANS.

1. Judgment was obtained against a married man, after which his wife died, leaving no one residing with him except an adult married son, whose wife was living apart from her husband. Levy was then made, and a homestead and chattel exemption laid off, to both of which exceptions were taken by the creditors. Pending these exceptions, the debtor again married. *Held*, that the defendant was "the head of a family" at the date of the levy and was therefore entitled to both homestead and chattel exemption.

2. Moreover, the debtor, at the hearing below, was entitled to his homestead as the head of a family by virtue of his second marriage before sale had, even if not such head at the time of the levy previously made.

3. The finding of the Circuit Judge, that the homestead laid off was not excessive, affirmed.

Before KERSHAW, J., Sumter, October, 1884.

The case is fully stated in the Circuit decree, which was as follows :

This case was heard upon exceptions taken by the plaintiff to the return of the commissioners setting apart the homestead of the defendant.

At the October term, 1883, the plaintiff obtained his judgment; in December thereafter the defendant's wife died, leaving the defendant and an adult son, who had always resided in the family, occupying the homestead. On January 30, 1884, the plaintiff lodged and levied an execution on the land upon which was situated the family homestead. On February 12 thereafter the defendant applied for the homestead, and the same was set aside for him by commissioners duly appointed for that purpose on February 16. On May 1, 1884, the defendant married a second time, and continued to reside upon the homestead with his wife and adult son as before.

The plaintiff excepted to the assigment of the homestead on two grounds: First. Because the defendant was not a married man, or the head of a family, at the time of the aforesaid levy of the homestead. Second. Because the assignment was excessive, in that the land assigned was worth more than one thousand dollars. I shall consider these objections in their order.

1. Was the defendant the head of a family at the time of the levy of plaintiff's execution? He was not then a married man, but a widower, residing on the homestead with an adult son, who had always resided with him as a part of his family. When the judgment of plaintiff was obtained and entered, he was the head of a family and entitled to the homestead. If he continued to be the head of a family after the death of his then wife, by reason of his son continuing to reside with him as before, he continued to be entitled to a homestead up to the time of the levy and assignment.

In the first place, I premise by saying that I cannot agree with the remark of Chief Justice Moses, in *Garaty* v. *DuBose* (5 *S. C.*, 500), that the maxim that statutes in derogation of the common law are to be strictly construed, is to be applied to a constitutional provision like this, though the observation may have been well enough, qualified as it was. Mr. Cooley says, "There can seldom be either propriety or safety in applying this maxim to constitutions." *Con. Lim.*, 74. I may also remark that the policy of the people of this State has been demonstrated to be a liberal one in this regard, for when the courts have limited it by construction, the constitution or the statutes have been amended to establish the right so questioned.

In the case just cited, it is said "that the exemption was intended not alone as a benefit to the head of the family, but to those whose relations to the head of the family demand, on the one hand, support and protection, and on the other require a contribution by the aid of their labor to the maintenance and conduct of the general establishment to which they belong. This would naturally be the case between parent and minor children, who, in terms, are embraced within the exemption. It would not follow that, although the head of a family might not be a parent, the one substituted as a head would lose the favor of the

provision, for it would extend to one having under his roof those so connected with him by the ties of residence and association as to become part and parcel of his household, changing their domicile with him, and having no residence but that which they enjoy under his favor. It is not necessary to constitute a family that the relation of parent and child must exist."

The definition of family, as given by Mr. Webster, is quoted there as follows: "The collective body of persons who live in one house and under one head or manager." In *Bradley* v. *Rodelsperger* (3 *S. C.*, 226), it was held that a childless widow might be the head of a family, the court saying, "There is no ground for holding that a person without children cannot occupy the position of head of a family." In *Moore* v. *Parker* (13 *S. C.*, 487), it is said, "An unmarried man is not the head of a family, unless made so by having children, or perhaps other members of a household, around him constituting a family." This was a remark of the Circuit Judge, which the Supreme Court affirms, saying, "The petitioner, though childless, might nevertheless have been the head of a family." This, of course, could only mean that a family may consist of other persons than a wife or child, if dwelling together as members of the same household and under the protection of the same head.

It is the family relation, therefore, which constitutes the family, and the mere attainment of his majority by a child who continues under the protection and control, and resides under his roof, laboring for the father, as he did during his minority, does not, in my opinion, change the family relation between them. Says Chancellor Kent (2 *Com.*, 190): "A father's house is always open to his children. The best feelings of our nature establish and consecrate this asylum. Under the thousand pains and perils of human life, the home of the parents is to the children a sure refuge from evil and a consolation in distress. In the intenseness, the lively touches, and unsubdued nature of parental affection, we discern the wisdom and goodness of the great Author of our being and Father of mercies." It is this principle of nature, nourished by religion, which constitutes home, the best foundation for human society, social and political; the unit of the State; the soundest basis upon which it can rest;

the strongest safeguard against anarchy, agrarianism, and revolution.

To preserve this sacred institution for the good of the State is the true object of these exemptions—to prevent the dispersion of families and the severance of those sacred ties which make the home the great conservative feature of a republican state. The framers of the constitution never could have contemplated the destruction of the family as soon as the children became of age, and the father bereft of the comfort and solace and support of the wife of his love and mother of his children, and leave him desolate and a wanderer in his old age. The principles involved in these questions are higher and more important than those affecting merely the rights of property. They cannot be safely settled by analogies derived alone from the business relations of men. They are to be construed in no narrow, technical spirit, but upon broad, liberal, and humane principles.

Hence it is that it has been decided that a homestead, once duly acquired by a man, the head of a family, is not lost by the subsequent death, marriage, and removal of all the family but himself. *Kessler* v. *Draub*, 52 *Tex.*, 575. In *Silloway* v. *Brown* (12 *Allen*, 34), the husband was held entitled to the homestead when the wife died and the children moved away. *Doyle* v. *Coburn* (6 *Allen*, 71) and *Woods* v. *Davis* (34 *Iowa*, 264), are cases where the wife was divorced and given the custody of the children, yet the husband was held entitled to the homestead. In the latter case the court said : "Although a homestead estate cannot be acquired except by the head of a family, yet when once acquired and still occupied by him, it has been held not to be defeated or lost by the death or absence of his wife and children." This was under a statute which limited the exemption to a "householder" "having a family." *Thomp. Homest.*, § 72.

It is there said that in a late case in Georgia the opinion is expressed by Jackson, J., that it was not the intention of the framers of the constitution of that State, in establishing the provision guaranteeing the homestead exemption, to break up a man's family just as soon as his wife died and his children became of age. If they had all left him, their voluntary departure would have

broken it up; if they remained with him, especially daughters, dependent upon him as much when twenty-one as when twenty, they would still be in the sense of the constitution, a legitimate and component part of his family, and he would be entitled in law to a home for himself as their head, and for them as his household. *Blackwell* v. *Broughton*, 56 *Ga.*, 392. See, also, *Taylor* v. *Boulware*, 17 *Tex.*, 74.

There are conflicting decisions, and the statutes are not all alike, but the decisions cited are all more or less applicable to the case at bar. Upon the whole, therefore, I conclude that the defendant did not lose the right of homestead at the death of his wife. I have not noticed the fact that the son of the defendant who resides with him is a married man, and that his wife does not live with him, because I do not consider that this circumstance can affect the view I have taken unfavorably If the son's wife lived with him as a part of the defendant's family, and especially if they had children, there would no longer be a doubt that the defendant would be entitled to the homestead as the head of the family. The wife may at any moment return to the house where the husband resides, and if she has children, bring them with her. In this case it does not appear that the son has no children.

II. If, however, I am in error in the view I have taken above, and the defendant was not entitled to the homestead at the time of the levy, is he now entitled? The case of *Pender* v. *Lancaster* (14 *S. C.*, 25) is relied on by the plaintiff as authority to support the negative. In that case it was held that where an execution debtor marries after a levy upon his personal property, but before a sale thereof, he does not thereby become entitled to the homestead exemption. The decision there is placed upon the ground that the levy gave the plaintiff a lien or special property in the chattel levied and seized upon, which was prior in time to the accrual of the right of homestead, and according to the maxim, *qui prior est in tempore, prior est de jure*, the right of homestead arising subsequently could not divest the prior right of the plaintiff. The learned judge cites no authority for the view taken by the court, but rests it simply upon the ground stated.

It is stated in the opinion that there is no difference in the

nature of the liens acquired by the levy of an execution of personal property, and that acquired upon real property by the entry of judgment, inasmuch as both are amenable to the rule that rights must be determined according to their respective priorities. This observation of Justice Willard is only a part of the reasoning adopted, and not a point decided, and, therefore, may, without presumption, be inquired into by a Circuit Judge. With all deference, I think there is a material difference between the effect of a levy of execution upon personal property, and an entry of judgment, creating a lien on real property.

The levy of an execution on personalty conveys a special property in the chattel seized, and transfers the possession to the sheriff. He may have an action to recover the possession, even against the owner, if he detains it after levy. The property of the owner is divested, and the sheriff may sell the chattels at any time, even after he has gone out of office, if not restrained by statute. *Gibbes* v. *Mitchell*, 2 *Bay*, 122. "When a sheriff levies upon personal property, it becomes his own for all legal purposes. He can maintain an action for it, even against the debtor himself, at any time till it is sold." *McClintock* v. *Graham*, 3 *McCord*, 243. Goods left in the hands of the defendant after levy is a continuance of the possession of the sheriff. *Moss* v. *Moore*, 3 *Hill*, 278. "Though it is clear that the seizing and levying of goods and chattels, by operation of law, vests the property in the sheriff, yet it is very different with respect to real estate. It shall remain the property of the defendant in the suit till actually sold." *Sims* v. *Randall*, 2 *Bay*, 524; see, also, *Bank* v. *Manufacturing Company*, 3 *Strobh.*, 191.

The remark of Judge Willard would seem to intimate an opinion that the lien of a judgment attached to land at a time when the defendant was unmarried, would prevail against the claim of a homestead where the defendant afterwards married before any steps were taken to enforce the judgment. That proposition would not now be maintained, since it has been decided otherwise in the case of *Chafee & Co.* v. *Rainey*, 21 *S. C.*, 11. In that case the defendant was a married man when the judgment was entered, but became a widower and married again before the levy. He was held entitled to the homestead. Here there was a levy

made while the defendant was still a widower, but he married again after the levy and before the sale. As has been said, a levy on lands under an execution does not transfer any right of property in the land. The title remains in the defendant just as before. The only effect of the levy was to give the sheriff a power of sale. The plaintiff acquired no new rights in regard to the land. The circumstance, therefore, of a levy having been made before the marriage in this case does not distinguish it in principle from the case last cited, where the levy was made after the second marriage of the defendant.

The exemption allowed by the constitution is from attachment, levy, or sale of the homestead. The protection is against a sale, as much as against a levy, or an attachment. If, at the time of the levy, there was no right of homestead, the levy would be good; but if, after a valid levy, there arose the circumstances which would entitle the defendant, as the head of a family, to the homestead, the sale would be invalid. The sheriff is required, before selling the real estate of any head of a family resident in this State, to cause a homestead to be set off in the manner that is prescribed by law. *Gen. Stat.*, § 1994. It is made his duty, "before selling," to ascertain whether there be the head of a family entitled to the homestead on the property levied on. The statute then proceeds thus:. "Should any officer sell any real estate in violation of the provisions of this chapter, and of section 32, article II., of the constitution of the State of South Carolina, he shall be guilty of a misdemeanor, and shall be liable in damages to the party injured for all injuries by reason of his wrongful levy or sale." § 2003.

It cannot be denied that here is a debtor, resident on the land levied, who is also the head of a family at this time; how, then, can the sheriff proceed to sell the homestead, in view of the statute cited ? The court has no power to repeal or modify the statute by refusing the claim of the defendant and directing the sale to proceed. Such a sale would be unlawful and therefore void. "If a statute inflicts a penalty for doing an act, the penalty implies a prohibition, and the thing is unlawful, though there be no prohibitory words in the statute." 1 *Kent*, 467. The sale of the homestead of a head of a family is as much

prohibited as if the statute had expressly forbidden it, and the courts cannot give validity to such a plain violation of the statute law.

I therefore conclude that the defendant is, in any aspect of the case, entitled to his homestead.

III. But the assignment in this case appears to the minds of many witnesses to be excessive. There is a great conflict of opinion on the subject, and I find myself unable to decide the question of value. For the plaintiff, six witnesses, apparently disinterested, testify that in their opinion the land and buildings assigned for homestead are worth from two to three thousand dollars, and one of them values it at three thousand five hundred dollars. The plaintiff, on oath, says he will give for the land assigned one thousand dollars and release his judgment against the defendant.

On the other hand, the defendant produces more than twenty witnesses, equally disinterested seemingly, residing in the neighborhood, who swear that the value of the property is from about seven hundred to a thousand dollars. The commissioners valued it at nine hundred dollars. The auditor, Captain Delgar, another witness, testified that it was assessed by the board of equalization at two dollars and fifty cents per acre, which is regarded as the value of lands in that neighborhood, and supposes, with buildings and improvements, it is worth from three to four dollars per acre. Col. Wm. J. Reynolds testifies that in the year 1880 the defendant offered to sell him the same land, with two hundred acres additional, for twelve hundred dollars, and he refused to buy, because he did not think it worth that amount; that he himself sold to defendant fifty acres of the land assigned as a homestead, for two dollars per acre; and he has lived within a mile of the place for fifty years, and that it is worth only nine hundred dollars. L. M. Smith, an intelligent and successful merchant and farmer, long residing in the neighborhood, testified that the defendant, in the year 1880, offered to sell him three hundred and seventy-four acres of the land, including the homestead, for twelve hundred dollars, one-half cash, and he refused to purchase, because he did not think the land worth the money.

What, then, is the duty of the court under these circumstances?

The commissioners are required by the statute to be sworn "to impartially appraise and set off by metes and bounds a homestead, not exceeding one thousand dollars in value." Upon exceptions filed to their return, as prescribed by the statute, "the court may, upon good cause being shown," order a reappraisement. If the evidence was such as to satisfy me that the homestead assigned exceeds in value the amount allowed by law, there would be good cause to set it aside. But the case presented is not that. It is a case of some uncertainty as to the value, but it is not shown that the commissioners erred in their estimate. Is that enough to justify the court in ordering a reappraisement? At first I inclined to that opinion, but upon further consideration, I am forced to the conclusion that the mere difference of opinion as to the value, making a case of some doubt, is not enough to authorize me to set aside the return of the commissioners. It appears to me that in such a case the return must prevail.

In Alabama the principle is laid down that "even if the freeholders appointed to allot the debtor's homestead by the statute of that State are to be regarded as officers of the court and subject to its supervision, which the court does not decide, their action should not be disturbed except in case of fraud, corruption, or irregularities seriously affecting the rights of one or both of the parties." *Thomp. Homest.*, § 666.

The case is analogous to that of commissioners in partition, of whom it was said by Chancellor DeSaussure, in *Greer* v. *Winds* (4 *DeSaus.*, 86), that the partition of lands by the commissioners, residing on the spot, and possessing local knowledge of the property, was instituted for the benefit of the citizens. It was a species of domestic tribunal, similar in some respects to arbitration, and that their acts ought to be supported unless shown to be clearly erroneous and unjust; that the division made by the commissioners in the present case did not appear to be so erroneous as to induce the court to set it aside. Several of the witnesses certainly had stated that they thought it an unequal division; but one of them said he did not know that a better division could be made, and some of the witnesses acknowledged themselves incompetent judges; none of them were acting under the obligation of an oath when they examined the land, nor was their

attention drawn thereto particularly by any duty; whereas the commissioners were men of the highest character for general integrity, and they had a particular knowledge of the land in question. They were acting under the sanction of an oath, and made a very particular examination of the land; and Mr. Chapman swore he believed as fair a division of the land was made as could be made.

These remarks apply with equal force to the case now under consideration. The commissioners constitute a body created by law for the discharge of the particular duty which they have discharged under the solemn sanction of an oath. Their return is a finding of fact by a body charged by law with the performance of a certain duty which involves their ascertainment of the fact which they have found. Their finding, like that of a jury, must stand until it is overthrown by a preponderance of testimony. Here the preponderance is really on the side of the return. Of what avail would it be to commit the question to new commissioners? If, on a reappointment, the commissioners should vary in their finding as to the value from that found by the present commissioners, would not the same conflict of opinion be shown to set aside that return as has been brought here either to attack or sustain this return? The question is one of opinion, and can never be settled with mathematical certainty.

For these reasons, it is ordered and adjudged, that the exceptions be overruled and the return of the commissioners be confirmed; and that the plaintiff pay the costs and disbursements herein, to be adjusted by the clerk.

The plaintiff in the execution appealed upon the following exceptions:

I. That his honor erred in adjudging that the defendant was entitled to a homestead exemption, said defendant not being the head of a family, having no one dependent on him for support, and his son, who lived with him, being an adult, and having property of his own, conducting his own business, and not dependent on, or under the control of, his father.

II. That his honor erred in adjudging that the marriage of defendant, after levy made and the plaintiff had exhausted all

legal means to collect his debt while no exemption existed, entitles him to a homestead exemption.

III. That his honor erred in refusing to order a reassignment of the homestead.

*Messrs. H. F. Wilson* and *J. T. Hay*, for appellant.

*Mr. Jos. H. Earle*, contra.

July 27, 1885. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. (Omitting the statement of facts.) The appeal involves the two questions decided below, which we will consider in their order above.

First. Was the defendant the head of a family, in a homestead sense, when the property in question was levied upon by the plaintiff? The meaning of the term family, as taken from the best lexicographers, is: "The collective body of persons who live in one house, and under one head or manager, a household, including parents, children, and servants, and, as the case may be, lodgers or boarders." *Webster.* If this is the true meaning of the term family, and if it was used in the constitution in this sense, there certainly could be no doubt that the defendant was the head of a family at the date of the levy. Because it is admitted that his son was a part of his household, living with him in the same house, under his control and employment, he being the head and the manager.

Have we any reason to conclude that this term was used in the constitution in some curtailed and limited sense, and not in this general sense? In *Garaty* v. *Dubose* (5 *S. C.*, 500), the court held that a bachelor, having no person dependent upon him, and none residing with him except servants and employees, is not the "head of a family" in the constitutional sense; and Chief Justice Moses, in delivering the opinion of the court, did intimate that inasmuch as the homestead exemption was in derogation of the rights of creditors at common law, it was not entitled to such liberal construction as would extend it to those who are not within the spirit and policy of the provision. Even admitting this to be true, yet he laid down no rule which would authorize

the court to resort to anything else but the general meaning of the term "family," when called upon to determine whether a certain party was the head of the family. In the case of *Garaty* v. *Dubose* the court held that Dubose was not entitled to the homestead. The facts of that case, however, will show that in excluding Dubose the court did not fall back on any limited or restricted sense of the term "family" in order to reach its conclusion, but applied the ordinary meaning to that term. Dubose was a bachelor, a farmer, with hired laborers and employees, carrying on his farming operations. But it did not appear that any one was living with him under the same roof and a part of the same household. He, then, was not entitled to a homestead under the most liberal construction of the term family, as he was in no sense the "head of a family."

Has the term "family" been limited in its general and ordinary meaning as defined in Webster by any of our cases on the subject of homestead? We have found no such case. On the contrary, the case of *Bradley* v. *Rodelsperger* (3 *S. C.*, 227) holds expressly that this term, as used in the constitution, must be taken in its ordinary sense. And in that case the court below having held that a childless widow could not be the head of a family in the sense of the constitution, this court reversed the judgment below, and in remanding the case said: "The constitution has not given any definition of the term family, nor indicated any of its necessary ingredients; the term must, therefore, be taken in its ordinary sense. In this sense it is not essential that it should include children."

Taking the term "family," then, in its ordinary sense, which includes persons living in one house, and under one head or manager, we think the Circuit Judge was right in holding below that the defendant was the "head of a family." His son was living with him as a part of his family, and his son being a married man, no doubt entitled to have his wife and children with him, if he had any children, certainly this constituted a family, of which the defendant was the head.

But, independent of this, we think the defendant was entitled to the homestead under the principle of the case of *Chafee & Co.* v. *Rainey*, 21 *S. C.*, 11. In that case the defendant was a mar-

ried man when the judgment was entered, but became a widower and was married again when the levy was made. The homestead was resisted on the ground that a lien attached during the time the defendant was a widower, which his subsequent marriage could not divest. This court held that the question in such cases is not one of divesting liens, but is whether a state of facts constituting a right of homestead exists at the time that the sale is attempted to be enforced; in other words, whether at that time the defendant is the "head of a family," and whether the property claimed to be exempted is the family homestead. This principle may not apply to the personal property herein under the case of *Pender* v. *Lancaster* (14 *S. C.*, 25), that property having been levied upon while the defendant was a widower. But the homestead in that, as well as in the real estate, we think was exempt, as held above.

On the second question the Circuit Judge upon full testimony having determined that the homestead allowed was not excessive, we see nothing in that testimony authorizing this court to overrule his finding on that subject.

It is the judgment of this court that the judgment of the Circuit Court be affirmed.